UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

STEVEN RICHARD TAYLOR,

        Petitioner,

vs.                            Case No. 3:12-cv-444-BJD-MCR

SECRETARY, FLORIDA DEPARTMENT
OF CORRECTIONS, et al.,

        Respondents.

_____

## **ORDER**

## I.  INTRODUCTION

Through counsel, Petitioner Steven Richard Taylor, a death-sentenced inmate, filed a Petition for Writ of Habeas Corpus Under 28 U.S.C. § 2254 (Petition) (Doc. 1).  Petitioner challenges his state court (Duval County) conviction for murder in the first degree, burglary of a dwelling and sexual battery.  He filed a Memorandum of Law (Memorandum) (Doc. 2).  Respondents filed a Response Opposing Habeas Petition (Response) (Doc. 13).[1]

---

[1] Respondents filed an Appendix (Doc. 15), not scanned and filed separately on August 3, 2012.  The page numbers referenced are the Bates stamp numbers at the bottom of each page of the exhibit.  Otherwise, the page number on the document will be referenced.  The Court will hereinafter refer to the Exhibits contained in the Appendix as "Ex."  For the scanned documents (Petition, Memorandum, Response, Reply, etc.), the Court references the page numbers assigned by the electronic filing system.

Respondents filed a Notice of Supplemental Authority (Notice) (Doc. 16). Petitioner filed a Reply to Response Opposing Habeas Petition (Reply) (Doc. 18). See Order (Doc. 11). Petitioner also filed a Supplement to Memorandum of Law (Doc. 53), and Respondents filed a Response Brief to Petitioner's Supplement to Memorandum of Law (Doc. 54).

Petitioner raises four grounds in the Petition: (1) "[t]he state withheld evidence which was material and exculpatory in nature and/or presented false evidence in violation of Mr. Taylor's constitutional rights[;]" (2) "Mr. Taylor was denied the effective assistance of counsel at the guilt phase of the capital proceedings, in violation of the Sixth, Eighth and Fourteenth Amendments to the United States Constitution[;]" (3) "Mr. Taylor was denied the effective assistance of counsel at the penalty phase of his capital trial, in violation of his rights to due process and equal protection under the United States Constitution, as well as his rights under the Fifth, Sixth and Eighth Amendments[;] and (4) "[t]he court erred in denying Mr. Taylor's motion to suppress statements made to a police officer while in custody and after Mr. Taylor had invoked his rights to counsel in violation of the Fifth and Sixth Amendments to the United States Constitution." Petition at 31, 44, 66, 74 (capitalization and footnote omitted). Respondents calculate the Petition is timely. Response at 26-29.

## II. EVIDENTIARY HEARING

"In a habeas corpus proceeding, the burden is on the petitioner to establish the need for an evidentiary hearing." <u>Jones v. Sec'y, Fla. Dep't of Corr.</u>, 834 F.3d 1299, 1318 (11th Cir. 2016) (citations omitted), <u>cert. denied</u>, 137 S. Ct. 2245 (2017). To be entitled to an evidentiary hearing, the petitioner must allege "facts that, if true, would entitle him to relief." <u>Martin v. United States</u>, 949 F.3d 662, 670 (11th Cir.) (quoting <u>Aron v. United States</u>, 291 F.3d 708, 715 (11th Cir. 2002)) (citation omitted), <u>cert. denied</u>, 141 S. Ct. 357 (2020). <u>See</u> <u>Chavez v. Sec'y, Fla. Dep't of Corr.</u>, 647 F.3d 1057, 1060 (11th Cir. 2011) (opining a petitioner bears the burden of establishing the need for an evidentiary hearing with more than speculative and inconcrete claims of need), <u>cert. denied</u>, 565 U.S. 1120 (2012); <u>Dickson v. Wainwright</u>, 683 F.2d 348, 351 (11th Cir. 1982) (same).

If the allegations are contradicted by the record, patently frivolous, or based upon unsupported generalizations, the court is not required to conduct an evidentiary hearing. <u>Martin</u>, 949 F.3d at 670 (quotation and citation omitted). In this case, the pertinent facts are fully developed in this record or the record otherwise precludes habeas relief;[2] therefore, the Court can

---

[2] Petitioner was represented by counsel in the state-court post-conviction proceeding, and the state court conducted an evidentiary hearing.

"adequately assess [Petitioner's] claim[s] without further factual development," <u>Turner v. Crosby</u>, 339 F.3d 1247, 1275 (11th Cir. 2003), <u>cert. denied</u>, 541 U.S. 1034 (2004). Petitioner has not met his burden as the record refutes the asserted factual allegations or otherwise precludes habeas relief. Therefore, the Court finds Petitioner is not entitled to an evidentiary hearing. <u>Schriro v. Landrigan</u>, 550 U.S. 465, 474 (2007).

### III. HABEAS REVIEW

The Eleventh Circuit recently opined that federal courts are authorized to grant habeas relief to a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." <u>Lee v. GDCP Warden</u>, 987 F.3d 1007, 1017 (11th Cir. 2021) (quoting 28 U.S.C. § 2254). Further, under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), there is a very deferential framework, limiting the power of federal courts to grant relief if a state court denied a claim on its merits. <u>Sealey v. Warden, Ga. Diagnostic Prison</u>, 954 F.3d 1338, 1354 (11th Cir. 2020) (citation omitted) (acknowledging the deferential framework of AEDPA for evaluating issues previously decided in state court), <u>cert. denied</u>, 2021 WL 1240954 (U.S. Apr. 5, 2021); <u>Shoop v. Hill</u>, 139 S. Ct. 504, 506 (2019) (per curiam) (recognizing AEDPA imposes "important limitations on the power of federal courts to overturn the judgments of state courts in criminal cases").

Indeed, relief is limited to occasions where the state court's decision:

> "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." A state court's decision is "contrary to" clearly established federal law if the state court either reaches a conclusion opposite to the Supreme Court of the United States on a question of law or reaches a different outcome than the Supreme Court in a case with "materially indistinguishable facts." <u>Williams v. Taylor</u>, 529 U.S. 362, 412-13, 120 S. Ct. 1495, 146 L.Ed.2d 389 (2000). "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle" from Supreme Court precedents "but unreasonably applies that principle to the facts of the prisoner's case." <u>Id</u>. at 413, 120 S. Ct. 1495.

<u>Lee</u>, 987 F.3d at 1017-18.

This high hurdle is not easily surmounted; if the state court applied clearly established federal law to reasonably determined facts when determining a claim on its merits, "a federal habeas court may not disturb the state court's decision unless its error lies 'beyond any possibility for fairminded disagreement.'" <u>Shinn v. Kayer</u>, 141 S. Ct. 517, 520 (2020) (per curiam) (quoting <u>Harrington v. Richter</u>, 562 U.S. 86, 103 (2011)). Also, a state court's finding of fact, whether a state trial court or appellate court, is entitled to a

presumption of correctness under 28 U.S.C. § 2254(e)(1). "The state court's factual determinations are presumed correct, absent clear and convincing evidence to the contrary." Sealey, 954 F.3d at 1354 (quoting 28 U.S.C. § 2254(e)(1)). This presumption of correctness, however, applies only to findings of fact, not mixed determinations of law and fact. Brannan v. GDCP Warden, 541 F. App'x 901, 903-904 (11th Cir. 2013) (per curiam) (recognizing the distinction between a pure question of fact from a mixed question of law and fact), cert. denied, 573 U.S. 906 (2014). Furthermore, the second prong of § 2254(d), requires this Court to "accord the state trial court [determination of the facts] substantial deference." Dallas v. Warden, 964 F.3d 1285, 1302 (11th Cir. 2020) (quoting Brumfield v. Cain, 576 U.S. 305, 314 (2015)), petition for cert. filed, (U.S. Feb. 27, 2021) (No. 20-7589). As such, a federal district court may not supersede a state court's determination simply because reasonable minds may disagree about the finding. Id. (quotation and citation omitted).

## IV. INEFFECTIVE ASSISTANCE OF COUNSEL

Claims of ineffective assistance of counsel are "governed by the familiar two-part Strickland[v. Washington, 466 U.S. 668 (1984)] standard." Knight v. Fla. Dep't of Corr., 958 F.3d 1035, 1038 (11th Cir. 2020), cert. denied, 2021 WL 1240957 (U.S. Apr. 5, 2021). To prevail on a claim of ineffective assistance of counsel, a petitioner must successfully show his counsel "made errors so serious that counsel was not

functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment" as well as show "the deficient performance prejudiced the defendant, depriving him of a 'fair trial, a trial whose result is reliable.'" Raheem v. GDCP Warden, No. 16-12866, 2021 WL 1605939, at *6 (11th Cir. Apr. 26, 2021) (quoting Strickland, 466 U.S. at 687). As both components under Strickland must be met, failure to meet either prong is fatal to the claim. Raheem, 2021 WL 2605939, at *6 (citation omitted).

Finally, the Eleventh Circuit warns:

> because "[t]he standards created by Strickland and § 2254(d) are both 'highly deferential,' . . . when the two apply in tandem, review is 'doubly' so. Harrington [v. Richter, 562 U.S. 86, 105 (2011)] (internal citations and quotation omitted). Thus, under § 2254(d), "the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard." Id.

Tuomi v. Sec'y, Fla. Dep't of Corr., 980 F.3d 787, 795 (11th Cir. 2020) cert. denied, 2021 WL 1074184 (U.S. Mar. 22, 2021).

## V. THE OFFENSES

The Florida Supreme Court (FSC), in its opinion addressing Petitioner's direct appeal, detailed the facts of the case. Taylor v. State, 630 So. 2d 1038, 1039-41 (Fla. 1993) (per curiam), cert. denied, 513 U.S. 832 (1994). For context, the facts will be repeated here:

> The record reflects that on September 15, 1990, at about 11:30 p.m., the victim, fifty-nine-year-old

Alice Vest, returned to her mobile home in Jacksonville after spending the evening with a friend. Earlier that evening, the appellant, Steven Richard Taylor, and two friends were out driving and listening to the radio. Around midnight, the driver of the car dropped off Taylor and his friend, who was later to become his accomplice, near the victim's neighborhood.

Sometime in the early morning hours of September 16, a Ford Ranchero was stolen from a residence near the place where Taylor had been dropped off. At about 4:30 a.m., after the vehicle had been stolen, a passing motorist noticed the Ford Ranchero parked in a driveway next door to the mobile home where the victim lived. Later that morning, the Ford Ranchero was found abandoned behind a used car dealership only a few blocks from where Taylor lived at the time.

On the same morning, neighbors discovered the victim's battered body in the bedroom of her mobile home. The medical examiner testified that the victim had been stabbed approximately twenty times, strangled, and sexually assaulted. The medical examiner further testified that most of the stab wounds were made with a knife found at the scene of the crime, while the remaining stab wounds were made with a pair of scissors that were also found at the scene. The medical examiner stated that the victim was alive while she was being stabbed, that she was strangled with an electrical cord, and that the strangulation had occurred after the victim was stabbed.

The medical examiner also testified that the victim's lower jaw had multiple fractures and that she had received several blows to her head. The examiner testified that the fractures of the victim's jaw could

have resulted from being struck with a broken bottle found on the bed next to the victim, and that contusions to the victim's head were consistent with being struck by a metal bar and candlestick also found at the scene. Finally, the medical examiner testified that the victim's breasts were bruised, and that the bruises resulted from "impacting, sucking, or squeezing" while she was alive. In the medical examiner's opinion, the victim was alive at most ten minutes from the first stabbing to the strangulation. On cross-examination, the examiner stated that he did not know whether the victim was conscious during all or any part of the attack.

The testimony at trial also revealed that the phone line to the mobile home had been cut, that the home had been burglarized, and that various pieces of jewelry were missing.

In December of 1990, Taylor moved out of the duplex he had been sharing with a friend. In January, 1991, while Taylor's former roommate was removing a fence behind the duplex, he discovered a small plastic bag buried in the ground near the fence. The bag contained the pieces of jewelry taken from the victim's home during the attack and burglary. The roommate turned the jewelry over to the police and gave a statement. Later that month, Taylor visited the duplex with some friends. The former roommate testified that, at some point during the visit, Taylor went into the backyard and stared at the place where the fence had stood. During the following month, Taylor again returned to the duplex with friends. One of the accompanying friends testified that Taylor went into the backyard and returned a few minutes later with dirty hands. In response to the friend's inquiry as to what he was doing, Taylor allegedly responded that he had left some things there and that they were gone.

On February 14, 1991, the Duval County sheriff's office executed a search warrant on Taylor which authorized the officers to take blood, saliva, and hair samples from Taylor. Taylor was taken to the nurses' station at the county jail so that the samples could be taken, but not before Taylor invoked his right to counsel. Later that day, after the samples were taken, Taylor asked the investigating officer how long it would take to get the results back. Instead of directly responding to the question, the investigating officer asked Taylor why he wanted to know. Taylor responded that he was just wondering when they would be back out to pick him up. Taylor did not have long to wait. Two days later, on February 16, Taylor was arrested, and, on March 3, a grand jury returned a two-count indictment against Taylor for first-degree murder and burglary. The indictment was amended on September 12, 1991, to add a third count for sexual battery.

At trial, the State presented the testimony of Timothy Cowart, who had shared a cell with Taylor in the Duval County jail. Cowart testified that, in a jailhouse conversation with Taylor in early April, Taylor stated that he had been involved in a burglary and that it was a messy job; that the lady surprised him inside the trailer; and that he stabbed her and choked her and then strangled her with a cord to make sure she was dead. Cowart also testified that Taylor said the State could place him, but not his accomplice, at the scene of the crime, and that the State could convict him with the evidence it had. Taylor allegedly asked Cowart to hide a gun and handcuff key in the bathroom at the hospital; Taylor would then feign an illness, get taken to the hospital, and have a chance to escape.

A Florida Department of Law Enforcement lab analyst, who was an expert in serology, testified that

semen found on a bed covering and on a vaginal swab taken from the victim could not be tested. However, the analyst testified that semen found in the victim's blouse matched Taylor's DNA[3] profile.

In the guilt phase, Taylor presented only one witness, an agent of the Federal Bureau of Investigation. The agent testified that certain hairs found on the victim's body and clothing matched the pubic hairs of Taylor's accomplice. On cross-examination, the agent conceded that it is possible to commit a sexual battery and not leave any fibers or hair. Taylor then rested his case and the jury found him guilty as charged.

At the penalty phase proceeding, the State rested without presenting any additional evidence. Taylor presented the testimony of five witnesses. First, Taylor called Charles Miles, who lived next door to Taylor during Taylor's adolescence. Miles stated that Taylor frequently played with Miles' son and that Taylor was always very polite and respectful. Miles testified that on one occasion he and Taylor sat in Miles' garage and talked at length about religion. Taylor's next witness was Lloyd King, his uncle. King testified that Taylor had always been a polite person. The third witness, Judy Rogers, was a friend of the family who testified that she thought Taylor had a learning disability. Taylor's next witness was another uncle, Don King, who testified that, during fifth and sixth grades, Taylor experienced difficulty in reading and that his reading comprehension was poor. King also stated that Taylor was a very passive person. As his last witness, Taylor called his adoptive mother, Lenette Taylor, who testified that Taylor had experienced difficulty concentrating in school and that she had tried unsuccessfully to get him into special

---

3  Deoxyribonucleic Acid.

education classes. She testified that Taylor's I.Q. had been tested and found to be around 68 to 70, which, according to her, is in the mildly retarded range. On cross-examination, she acknowledged that, in 1979, when he was nine years old, Taylor had tested in a normal intellectual range. The record further reflects that, although defense counsel had Taylor examined by two mental health experts, counsel found it to be in Taylor's best interest not to present the experts' testimony at trial. As an additional mitigating factor, Taylor offered evidence that he was only twenty years old at the time of the murder.

The jury recommended the death sentence by a vote of ten to two. In sentencing Taylor to death, the trial judge found the following aggravating factors: (1) the murder was committed during the course of a burglary and/or sexual battery; (2) the murder was committed for financial gain; and (3) the murder was committed in an especially heinous, atrocious, or cruel manner. As the sole nonstatutory mitigating factor, the trial judge found that Taylor was mildly retarded. The trial judge sentenced Taylor to death for the first-degree murder, to fifteen years' imprisonment for the burglary, and to twenty-seven years' imprisonment for the sexual battery.

Id.

## VI.   GROUND ONE

**Ground One:   The state withheld evidence which was material and exculpatory in nature and/or presented false evidence in violation of Mr. Taylor's constitutional rights.**

Petitioner exhausted this ground by presenting it in his Amended Motion to Vacate Judgments of Convictions and Sentences. [4]   Ex. 31 at 565. Petitioner contends that despite discovery requests, "the name of FDLE analyst Shirley Zeigler" was not disclosed to defense counsel.   Petition at 33. Additionally, Petitioner claims "the FBI/FDLE protocol was not provided to the defense[.]"   Id. at 41.   As such, Petitioner contends Dr. Pollock's material change to the DNA protocols was not provided to the defense.   Id. Respondents agree that it appears that the claims regarding Zeigler's name and the material change in the DNA protocols were exhausted in the state courts.   Response at 30.

Petitioner raises Brady/Giglio claims in ground one.[5]   First, the Court will address the issue concerning the failure to provide the protocol to the

---

[4] Although not a model of clarity, Petitioner summarily raises a claim that counsel unreasonably failed to present evidence, referencing ground two of the Petition.   Petition at 31 n.30.   The Court assumes that Petitioner is referencing his claim of ineffective assistance of counsel at the guilt phase of the trial contained in ground two.   As such, the claim of ineffective assistance of counsel will only be addressed in ground two, not ground one, even though Petitioner states he "pleads his allegations in the alternative."   Id.   This vague and conclusory allegation of ineffective assistance of counsel contained in the footnote is otherwise insufficient and does not meet the standard for obtaining habeas relief.

[5] Brady v. Maryland, 373 U.S. 83 (1963) (to successfully sustain a Brady claim, a defendant must show favorable evidence – either exculpatory or impeaching, was willfully or inadvertently suppressed by the state, and the evidence was material, resulting in prejudice to defendant); Giglio v. United States, 405 U.S. 150 (1972) (to establish a Giglio violation, a defendant must demonstrate the testimony was false, the prosecutor knew the testimony was false, and the statement was material).

defense. Second, the Court will address Petitioner's claim that the state

suppressed evidence in its failure to reveal the name of Shirley Zeigler.

The circuit court, in denying the Rule 3.850/3.851 motion, found:

> To the extent that [t]he Defendant generally
> avers that the State violated <u>Brady</u> when it "withheld
> documents regarding the DNA testing," and <u>Giglio</u>,
> this Court denies this subclaim as facially insufficient.
> (Def's Mot. at 9, 25-29, filed May 23, 2005). <u>See
> Parker v. State</u>, 904 So. 2d 370, 375 n.3 (Fla. 2005); <u>see
> also</u> <u>Gordon v. State</u>, 863 So. 2d 1215, 1218 (Fla. 2003)
> ("A defendant may not simply file a motion for post-
> conviction relief containing conclusory allegations . . .
> and then expect to receive an evidentiary hearing.").
> The Defendant has had ample opportunity through
> pleadings and the evidentiary hearing to present
> evidence in support of the [sic] any <u>Brady</u> and <u>Giglio</u>
> subclaims. The Defendant has not taken advantage
> of these opportunities, and, as such, this Court finds
> that he has failed to prove, or even allege, the requisite
> prongs of <u>Brady</u> and <u>Giglio</u>. To the extent that these
> claims have been generally averred, the Defendant's
> <u>Brady</u> and <u>Giglio</u> subclaims are denied.

Ex. 48 at 2042 (footnote omitted).

On appeal of the denial of the post-conviction motion, the FSC addressed

the <u>Brady/Giglio</u> claims. Ex. 55; <u>Taylor v. State</u>, 62 So. 3d 1101, 1114-15 (Fla.

2011) (per curiam). The FSC recognized that, for both <u>Brady</u> and <u>Giglio</u>

claims, a defendant carries the burden of establishing a prima facie case based

upon a legally valid claim. <u>Taylor v. State</u>, 62 So. 3d at 1115 (citation

omitted). Although recognizing the post-conviction court did not examine the

evidence in the context of a <u>Brady</u> or <u>Giglio</u> violation, the FSC noted the post-conviction court did make credibility findings, concluding the testimony of the defense's post-conviction expert witness, Dr. Libby,[6] was unreliable with regard to Dr. Pollock's (the state's expert witness) ultimate findings. <u>Taylor v State</u>, 62 So. 3d at 1115.

The FSC, deferring to the factual findings of the post-conviction court on the questions of the credibility of witnesses and the appropriate weight to be given to the evidence, concluded that the <u>Brady/Giglio</u> claims concerning the FBI/FDLE protocols fail "under the materiality prongs of both <u>Brady</u> and <u>Giglio</u>." <u>Taylor v. State</u>, 62 So. 3d at 1115. The FSC explained its rationale for denying relief on these claims:

> **Even if we assume that the State inadvertently failed to disclose these protocols**, in light of the trial court's findings of fact, the alleged violations cannot 'reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." <u>Smith</u>,[7] 931 So. 2d at 796 (quoting <u>Strickler</u>,[8] 527 U.S. at 290, 119 S. Ct. 1936) (articulating the materiality prong of <u>Brady</u>). Further, there is no reasonable possibility that the

---

[6] The post-conviction court held it was "not convinced that Dr. Libby had the requisite background and experience in forensic DNA" for the court to give Dr. Libby's testimony considerable weight. Ex. 48 at 2037.

[7] <u>Smith v. State</u>, 931 So. 2d 790 (Fla. 2006) (per curiam).

[8] <u>Strickler v. Greene</u>, 527 U.S. 263 (1999).

allegedly false testimony could have affected the judgement of the jury. See id. (articulating the materiality prong of a Giglio claim).

Taylor v. State, 62 So.3d at 1115 (emphasis added).

Thus, hinging its decision on the materiality prongs of Brady and Giglio, the FSC found Petitioner's subclaim concerning the FBI/FDLE protocols fails. In doing so, the court precisely and comprehensively set forth what must be demonstrated to successfully prevail on a Brady claim or a Giglio claim. Taylor v. State, 62 So. 3d at 1114-15. In this instance, the FSC also deferred to the lower court's findings of fact and credibility determinations. Finding Petitioner did not meet the materiality prongs, the FSC found no entitlement to relief under these claims. The court noted, "[t]he only 'violation' identified by Taylor . . . is the fact that the FBI protocols utilized five to eight probes, while Dr. Pollock only used four." Taylor v. State, 62 So. 3d at 1115. Dr. Pollock readily admitted he deviated from the protocols, [9] but the only testimony challenging Dr. Pollock's findings was the testimony of Dr. Libby, whose testimony was discredited. Id.

In this Court's review, the Court presumes the factual determinations of the state court are correct. Petitioner has failed to rebut the presumption of

---

[9] At trial, Dr. Pollock testified that, with very minor modifications, the Florida Department of Law Enforcement (FDLE), Jacksonville Regional Crime Lab used FBI protocols. Ex. 6 at 606.

correctness with clear and convincing evidence.  28 U.S.C. § 2254(e)(1).  This Court also extends deference to the state court's credibility determinations. After hearing testimony, the post-conviction court made a credibility determination, finding the testimony of Dr. Libby unreliable.  The FSC did not substitute its judgment for that of the post-conviction court, the court that heard the testimony of the witnesses and assessed the witnesses' demeanor and credibility.  Of import, "Federal habeas courts have 'no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them.'"  Consalvo v. Sec'y for Dep't of Corr., 664 F.3d 842, 845 (11th Cir. 2011) (per curiam) (quoting Marshall v. Lonberger, 459 U.S. 422, 434 (1983)), cert. denied, 568 U.S. 849 (2012).

This Court will give AEDPA deference to the FSC's decision as it is not contrary to or an unreasonable application of Supreme Court law or based on an unreasonable determination of the facts.  Petitioner is not entitled to habeas relief on this contention of constitutional deprivation.

Next, the Court will address Petitioner's second contention, that the state suppressed evidence by failing to reveal the name of Shirley Zeigler to defense counsel.  This claim is simply without merit.  Defense counsel possessed Ms. Zeigler's initials prior to trial as they were contained in the calculated fragment reports submitted to defense counsel three days before

trial. <u>Taylor v. State</u>, 62 So. 3d at 1116. As Ms. Zeigler's initials were disclosed during discovery, Petitioner "fails to establish that the State suppressed Zeigler's name[.]" <u>Id</u>. at 1117. Since defense counsel had the information, any <u>Brady</u> claim must fail. <u>Id</u>. Additionally, the FSC concluded that Petitioner's <u>Brady/Giglio</u> claims would fail under the materiality prongs of the two tests as "the evidence is not material." <u>Id</u>. The FSC found Ms. Zeigler did not ultimately disagree with Dr. Pollock's findings and her testimony would unlikely undermine confidence in the outcome of the case, nor is there any reasonable possibility that the alleged false testimony could have affected the judgment of the jury. <u>Id</u>.

Notably, the FSC found, giving deference to the trial court's factual findings and credibility determinations, that (1) Dr. Libby was not credible; (2) in light of the findings of fact by the trial court, the alleged violations cannot reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict nor is there any reasonable possibility that the false testimony could have affected the judgment of the jury; (3) the initials of Shirley Zeigler were in fact disclosed during discovery, meaning the defense had the information it needed; and (4) Zeigler did not ultimately disagree with Dr. Pollock's findings, negating the materiality prongs of <u>Brady</u> and <u>Giglio</u>. Response at 44. Furthermore, "[n]ot only was Zeigler's existence disclosed

through the lab report, and thereby no <u>Brady</u> violation proved, there has been no showing that the prosecutor knowingly presented any false trial testimony concerning Zeigler, and thereby no <u>Giglio</u> violation has been demonstrated." Response at 62.

Of course, there was much more than just DNA evidence presented against Petitioner (Petitioner's presence near the murder scene and evidence of the stolen vehicle; his link to the victim's stolen jewelry, found buried in Petitioner's once shared back yard; Petitioner's jailhouse confession; Petitioner's being a Type A secretor, matching the semen found at the scene; and Petitioner's comment to the police, given after he provided blood, saliva, and hair for testing, as to when the police would be back to pick him up).[10] Ex. 6 at 533-34 (Diane Hanson, FDLE crime lab analyst assigned to the serology section, testified Petitioner's blood sample showed he is a type A secretor). <u>See</u> Response at 64; <u>Taylor v. State</u>, 630 So. 2d at 1039-40.

---

10 The record supporting the conviction at the guilt phase included, but is not limited to: "(1) testimony from Dr. James M. Pollock, Jr. matching semen recovered from a blouse found at the scene of the crime to Taylor's DNA profile; (2) testimony from Johnny Allen Taylor and Jason Leister indicating that Taylor, on two different occasions, went into the backyard of his old residence looking for items in the area where Ms. Vest's jewelry was found; (3) evidence and testimony from Detective T. C. O'Steen that the sailboat necklace, along with multiple other pieces of jewelry identified as belonging to the victim, was found buried in the backyard of Taylor's old residence; and (4) testimony from Detective John Robert Bogers and Timothy Dale Cowart about inculpatory statements made by Taylor." <u>Taylor v. State</u>, 260 So. 3d 151, 161 (Fla. 2018) (per curiam) (footnote omitted).

Upon review, Petitioner cannot satisfy the "contrary to" test of 28 U.S.C. § 2254(d)(1) as the state court rejected this ground based on <u>Brady</u> and <u>Giglio</u>. Moreover, Petitioner has not shown the state court unreasonably applied <u>Brady</u> and <u>Giglio</u> or unreasonably determined the facts. Finally, the record and reasonableness standard support the state court's findings.

Therefore, applying the AEDPA deference standard, Petitioner is not entitled to habeas relief on ground one. The Court concludes the FSC's decision affirming the trial court's decision on the guilt phase is not contrary to, nor an unreasonable application of controlling United States Supreme Court precedent. [11] As Petitioner has failed to demonstrate that the adjudication of the state court was contrary to or an unreasonable application of any clearly established federal law as determine by the United States Supreme Court or an unreasonable determination of the facts, Petitioner is not entitled to habeas relief.

## VII. GROUND TWO

**Ground Two: Mr. Taylor was denied the effective assistance of counsel at the guilt phase of the capital proceedings, in violation of the Sixth, Eighth and Fourteenth Amendments to the United States Constitution.**

---

[11] Even assuming a violation, Petitioner has failed to satisfy the standard set forth in <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637 (1993) (requiring a petitioner to demonstrate the violation had a substantial and injurious effect or influence in determining the jury's verdict). <u>See</u> Response at 67.

There is no doubt, at the time of pre-trial and trial, the use of DNA evidence in criminal prosecutions was in its infancy.  Today's expectations for attacking DNA evidence are certainly very different from those in existence in 1991.  Although this was Mr. Tassone's first case dealing with DNA, in 1991, not many Florida criminal defense attorneys would have had experience, extensive or otherwise, with dealing with DNA evidence.  A semen stain proved to be part of the evidence used to secure the conviction of Petitioner.  Petitioner contends that his counsel, Frank Tassone, failed to adequately investigate, prepare, and challenge this DNA evidence.  Petition at 44-45.  The record shows otherwise.

Mr. Tassone immediately tackled the issue that the defense would be facing novel DNA evidence and related testimony at trial by promptly filing a Motion for Appointment of Expert Witness to Assist Defendant.  Ex. 2 at 81-82.  His motion reflects counsel's awareness that he would need an independent expert to help prepare the defense and review any and all FDLE reports as to results from the serological and DNA testing.  Id. at 81.  Mr. Tassone suggested two prominent agencies to the court, Lifecodes International and Cellmark Corporation, signifying that Mr. Tassone already had a working knowledge of the expertise needed to attack the DNA evidence.  Id.

The trial court granted the motion and appointed David Goldman, M.D., Chief, Section on Genetic Studies, LCS, NIAAA. Id. at 87-88. Dr. Goldman, of the National Institute of Health (NIH), a well-recognized expert in his field, assisted the defense in preparation for addressing the DNA evidence. When Dr. Goldman asked for time to review copies of audioradiograms, the case file, the population data base, and the procedures used to obtain the DNA results, Mr. Tassone, on October 4, 1991, filed a Second Motion for Continuance. Id. at 161-62. The court addressed the motion. Ex. 20 (Friday, October 4, 1991) at 60. The court noted that the copies of the materials requested had been provided to Dr. Goldman, and Mr. Tassone confirmed that fact. Id. at 63. Mr. Tassone informed the court that Dr. Goldman had provided his opinion to counsel telephonically. Id. at 63-64. Mr. Tassone said he had an extensive conversation with Dr. Goldman and was satisfied that Dr. Goldman had assisted counsel as much as he could. Id. at 64. Mr. Tassone assured the court that Dr. Goldman received everything he asked for in order to assist counsel.[12] Id.

The court noted that defense counsel had expressed an intention to not call Dr. Goldman at trial based on Dr. Goldman's verbal report to counsel. Id.

_____

[12] Dr. Pollock, the state's expert at trial, testified he knew Dr. Goldman, identified as a professor at the NIH. Ex. 6 at 605.

Mr. Tassone confirmed that was the case, but he also advised the court it may be necessary for defense counsel to be in telephone communication with Dr. Goldman during the course of the trial. Id. Mr. Tassone mentioned that in his last conversation with Dr. Goldman, which took place on Wednesday or Thursday, Dr. Goldman told counsel where he would be located. Id. at 65. Counsel also told the court he could not state with specificity that he would not call Dr. Goldman as that decision would be dependent on what happened during the course of the trial, but that counsel currently did not intend to call Dr. Goldman as a witness. Id. The court took the motion concerning Dr. Goldman under advisement until Monday (October 7, 1991). Id. at 69.

On October 7, 1991, Mr. Tassone told the court he had spoken with Dr. Goldman on Saturday and Sunday, and that Dr. Goldman had provided telephone numbers. Ex. 20 (Monday, October 7, 1991) at 81-82. Mr. Tassone said, "[i]t may arise that I may ask for a period of time to talk to Dr. Goldman during an evening and perhaps to recess for that period of time until the following morning." Id. at 82. Mr. Tassone confirmed he did not need a continuance. Id. The court found the motion for continuance moot. Id.

At the post-conviction evidentiary hearing, Mr. Tassone testified that this would have been his first case involving DNA evidence and it was only the second case in the circuit or the state using DNA results. Ex. 38 at 1382, 1397-

98.    He further testified he had an independent recollection of what Dr. Goldman told him prior to trial:

> And Dr. Goldman essentially indicated that on the basis of what he received or what I told him or both that he essentially said that in his opinion that the DNA testing was done properly, or maybe not properly was the word but that he didn't have any major complaints with the DNA testing.

EH at 1387-88.

Mr. Tassone said he discussed protocols with Dr. Goldman.  Id. at 1389. Mr. Tassone readily admitted he was not familiar with Frye[13] hearings in 1991.  Id. at 1393, 1398.  He testified that, after receiving the requested documents, he would have inquired of Dr. Goldman what things could be attacked at trial.  Id. at 1412.  Upon preparing and formulating questions regarding Dr. Pollock's findings, Mr. Tassone attested he felt he did an adequate job during voir dire and cross-examination of Dr. Pollock in the 1991 trial.  Id. at 1413.

Mr. Tassone said he asked Dr. Pollock about faint bands, the initials JP on the autoradiograms, the initials SLZ on the calculated fragment length documents, match criteria, and the differences in measurements of Dr. Pollock and of Shirley Zeigler.  Id. at 1413-18.  Mr. Tassone said he had far more than

---

13  Frye v. United States, 293 F.1013 (D.C. Cir. 1923).

one conversation with Dr. Goldman and he had a very good level of comfort dealing with DNA issues after speaking with Dr. Goldman. Id. at 1418-19.

As far as experience, Mr. Tassone said, he conservatively estimated that he had dealt with approximately fifteen death penalty cases prior to Mr. Taylor's case. Id. at 1420. Mr. Tassone stated he had been both a prosecutor and a defense attorney. Id. He confirmed that he reviewed the relevant reports and made decisions as to which people to depose prior to trial, including deciding to depose Dr. Pollock. Id. at 1420-21. As far as coming to the decision to not call Dr. Goldman as a witness, in response to inquiry, Mr. Tassone explained:

> Q  I apologize.  Why did you decide not to call Dr. Goldman as a witness?
>
> A  Probably because I felt comfortable in cross examining Dr. Pollock.
>
> Q  Is it some times [sic] better to get your points across in just cross examining a particular witness as opposed to putting another expert that could kind of corroborate what that expert – original expert called by the State testified to?
>
> A  Sure.

Id. at 1428-29.

In the Petition, Petitioner claims he received the ineffective assistance of trial counsel based on counsel's failure to request a Frye hearing and

adequately investigate, prepare, and challenge the DNA evidence; failure to present an adequately prepared DNA expert to effectively challenge Dr. Pollock's findings; and, failure to file a motion in limine to suppress the blouse or object to the lack of foundation and a break in the chain of custody. Petition at 44-65.

Relying on the Strickland two-pronged standard, the trial court denied the Rule 3.850/3.851 motion. Ex. 48 at 2029-30. As noted above, the FSC affirmed the decision of the trial court. Taylor v. State, 62 So. 3d 1101. As the state court properly applied the two-pronged Strickland standard of review, Petitioner cannot satisfy the "contrary to" test of 28 U.S.C. § 2254(d)(1) as the state court rejected Petitioner's claim based on Strickland.

Of import, the trial court, regarding the claim that Petitioner was ineffective for failure to file and litigate a motion in limine pursuant to Frye, found Petitioner failed to satisfy the performance prong of Strickland. Ex. 48 at 2033-34. See Taylor v. State, 62 So. 3d at 1111 (finding Petitioner fails under the deficiency prong as the failure to request a Frye hearing did not result in ineffectiveness of counsel and any failure to present particular evidence was not essential for counsel to be considered effective). The trial court also found Mr. Tassone adequately challenged the serology and DNA evidence. Ex. 48 at 2037. The court relied on the fact that counsel deposed

the state's expert, requested the appointment of a defense expert, consulted with the defense expert, and communicated sufficiently with the defense expert to obtain "enough ammunition . . . to effectively cross examine the State's expert, Dr. James Pollack [sic]." Id. at 2035. Of note, Mr. Tassone asked for permission to voir dire Dr. Pollock, and once permission was granted, Mr. Tassone vetted Dr. Pollock's limited experience in being qualified as an expert, the lack of quality control analysis of the laboratory, and the potential for human error in the analysis. Id. After this questioning, Mr. Tassone refused to stipulate to Dr. Pollock's qualifications. Id.

The trial court recognized Mr. Tassone's vigorous cross examination of Dr. Pollock, attacking Pollock's credibility, analysis, methodology, and the matter of quality control. Id. at 2035-36. Mr. Tassone's examination included pointed questions concerning the consideration of faint bands, bands too faint to meet FBI standards, and the FDLE laboratory's use of a broadened match criteria of 2.5 per cent compared to the apparent industry standard of 1 per cent. Id. at 2036. As such, the trial court found Mr. Tassone did not commit error under the Strickland standard of review in that Mr. Tassone "adequately challenged the serology and DNA evidence[.]" Id. at 2037.

The FSC addressed the claim of whether counsel was ineffective for failure to request a Frye hearing, for failure to object to admission of DNA

evidence and Dr. Pollock's testimony about DNA, and for failure to provide any expert testimony to support trial counsel's attack on the DNA evidence. Taylor v. State, 62 So.3d at 1110-12. In rejecting Petitioner's claim of ineffectiveness, the court found Petitioner failed to satisfy the deficiency prong of Strickland. Id.

The post-conviction state court evidentiary hearing demonstrates the following. Petitioner's trial counsel, Mr. Tassone, is a very experienced lawyer and was considered to be experienced defense counsel at the time of Petitioner's trial in 1991. "When courts are examining the performance of an experienced trial counsel, the presumption that his conduct was reasonable is even stronger." Hardwick v. Benton, 318 F. App'x 844, 846 n.2 (11th Cir. 2009) (per curiam) (quoting Chandler v. United States, 218 F.3d 1305, 1316 (11th Cir.2000)). Here, the trial court found Petitioner failed to overcome the presumption of effective performance accorded to his counsel. See Taylor v. State, 62 So. 3d at 1109 ("There is a strong presumption that trial counsel's performance was not ineffective.").

Indeed, the FSC found Petitioner's claim of ineffective assistance of counsel failed under the deficiency prong with respect to the contention that counsel was ineffective for failure to request a Frye hearing, id. at 1110-11, for failure to object to admission of DNA evidence and to Dr. Pollock's testimony

about DNA, id. at 1111, and finally, for failure to provide any expert testimony to support trial counsel's attack on the DNA evidence. Id. at 1111-12. Importantly, the court found counsel made a strategic decision not to call the expert, negating the claim of deficient performance. Id. at 1112. Notably, the strategic decision as to whether to present witness testimony is left within trial counsel's domain. Waters v. Thomas, 46 F.3d 1506, 1512 (11th Cir.) (citation omitted) ("[w]hich witnesses, if any, to call, and when to call them, is the epitome of a strategic decision, and it is one that we will seldom, if ever, second guess."), cert. denied, 516 U.S. 856 (1995). Here, the Court recognizes that counsel is given wide latitude in making strategic decisions, and in this instance, Mr. Tassone's performance did not fall outside the norm.

Petitioner has failed to show his counsel performed deficiently. Indeed, this Court has found:

> First, whether or not defense counsel retains the services of an expert is trial strategy. Attorneys are generally not held to be constitutionally ineffective because of tactical decisions or strategies. United States v. Guerra, 628 F.2d 410, 413 (5th Cir. 1980), cert denied, 450 U.S. 934 (1981). Moreover, "[e]ven if in retrospect, the strategy appears to have been wrong, the decision will be held ineffective only if it was so patently unreasonable that no competent attorney would have chosen it." Adams v. Wainwright, 709 F.2d 1443, 1445 (11th Cir. 1983), cert denied, 464 U.S. 1063 (1984).

<u>Sweat v. United States</u>, No. 3:06-CR-379-J-25MCR, 2011 WL 13287076, at *2 (M.D. Fla. Aug. 24, 2011) (not reported in F. Supp.). Here, defense counsel effectively cross examined the state's expert. Petitioner has failed to show the required prejudice under <u>Strickland</u> by any failure to call an expert witness. Just because the state called an expert does not mean that the defense must do the same. <u>Richter</u>, 562 U.S. at 111 (concluding <u>Strickland</u> "does not enact Newton's third law for the presentation of evidence, requiring for every prosecution expert an equal and opposite expert from the defense"). Finally, there is no reasonable likelihood that the testimony of a defense expert would have changed the verdict. The evidence against Petitioner "is abundant and essentially unrefuted." <u>Taylor v. State</u>, 260 So. 3d at 165.

Petitioner also claims his counsel's performance was deficient because he failed to request a <u>Richardson</u>[14] hearing during the course of the trial when Shirley Zeigler's name was tied to the initials on the calculated fragment report. In a <u>Richardson</u> hearing, the court would determine whether a discovery violation resulted in harm or prejudice to the defendant, inquiring into the surrounding circumstances such as whether the violation of a discovery rule was inadvertent or willful, whether the violation was trivial or

---

14 <u>Richardson v. State</u>, 246 So. 2d 771 (Fla. 1971).

substantial, and what effect the violation had upon the defendant's ability to prepare for trial.   <u>Richardson</u>, 246 So. 2d at 775.

Under the circumstances presented, counsel could not be deemed ineffective for failure to request a <u>Richardson</u> hearing because, "such a hearing was not appropriate under the circumstances."   <u>Taylor v. State</u>, 62 So. 3d at 1112.   In fact, there was no concealment by the state as the state provided the calculated fragment report prior to trial, and the document included Ms. Zeigler's initials.   There simply was no discovery violation or concealment, inadvertent or otherwise.   As such, counsel's performance cannot be deemed deficient.   Moreover, the FSC found no prejudice as Ms. Zeigler stated she agreed with Dr. Pollock's ultimate findings.   <u>Id</u>.

The record shows Ms. Zeigler testified at the evidentiary hearing that, by looking at the computer printout, she had no dispute "in terms of [her] findings versus Dr. Pollock's findings[.]"   Ex. 38 at 1274, 1284.   Thus, the FSC concluded that failure to request a <u>Richardson</u> hearing was harmless. <u>Taylor v. State</u>, 62 So. 3d at 1112.   Ms. Zeigler attested that an analyst "had the ability to do a manual override," but she did not think it had been part of the protocol and she did not recall seeing that in the procedures.   Ex. 38 at 1274-75.   Dr. Pollock testified the weak banding or signals were interpretable. <u>Id</u>. at 1684.   He found the signals were visible, he did not interpret them as

being an anomaly, and he relied on the results.  Id. at 1684.  He also stated

that this reliance was acceptable in the forensic scientific community.[15]  Id.

This Court concludes there was no discovery violation; therefore, counsel

was not ineffective for failure to request a Richardson hearing.  "An attorney's

actions are sound trial strategy, and thus effective, if a reasonable attorney

could have taken the same actions."  Harvey v. Warden, Union Correctional

Institution, 629 F.3d 1228, 1243 (11th Cir.) (emphasis added), cert. denied, 565

U.S. 1035 (2011).  A reasonable attorney could certainly have concluded that

there was no call for a Richardson hearing under these circumstances.  As "the

bounds of constitutionally effective assistance of counsel are very wide[,]" Mr.

Tassone's actions were within the broad range of reasonably competent

performance under prevailing professional standards.  Failure to meet the

deficiency prong of Strickland is fatal to Petitioner's claim of ineffective

assistance of counsel.  See Reaves v. Sec'y, Fla. Dep't of Corr., 872 F.3d 1137,

1151 (11th Cir. 2017), cert. denied, 138 S. Ct. 2681 (2018) (failure to satisfy one

Strickland component is fatal to the claim).

---

15 The FSC determined that even if Ms. Zeigler were presented to testify on retrial, she
would testify that she ultimately agreed with Dr. Pollock's conclusion that the semen found
on the green blouse matched Petitioner's DNA profile, and, as a result, there would be no
acquittal on retrial because the "direct evidence linking Taylor to the scene of the crime would
not be refuted by the presentation of Zeigler as an additional witness[.]"  Taylor v. State, 260
So. 3d at 165.

Petitioner also contends, had Mr. Tassone adequately prepared for trial, he would have developed the theory that the white blouse with blood stains found at the scene was introduced into evidence, but forensic testing was actually performed on a green or turquoise blouse.   Petition at 60.   Petitioner avers that there is no way to know the color of the blouse introduced into evidence at trial because there was no foundation laid.   Id. at 62-64.

The trial court, in its order denying post-conviction relief, held:

> Having reviewed the record with respect to the blouse, the Court notes that there were times during the examination of the witnesses when it would have been helpful *for clarity of the record*, for the prosecutor and Mr. Tassone to have asked the witnesses to specify the color of the blouse that was being introduced into evidence.   **However, it is evident that it was the green blouse that the witnesses were referring to in their testimony and which was entered into evidence at trial.**

Ex. 48 at 2042 (emphasis added).

The FSC deferred to this factual finding of the trial court, made after the trial court "examined the record, processed the evidence revealed during the evidentiary hearing, and made a *factual* determination" that the green blouse was the one the witnesses referred to in their testimony and the court entered into evidence at trial.   Taylor v. State, 62 So. 3d at 1113.   The FSC labeled this claim "a red herring" in rejecting the defense's theory of "a phantom white

blouse." Id. As such, the FSC soundly rejected the claim of ineffective assistance of counsel for failure to develop this theory as unfounded and unsupportable.

The record shows the following. Under State's Exhibits, there is listed "No. 61 blouse[.]" Ex. 1 at page 9 of Index. In his deposition, John C. Wilson, senior latent print examiner with FDLE, referred to 28I as a green shirt or blouse. Ex. 20 at 457. Dr. Pollock, in his deposition, referenced 28 INDIA as being the stain from the blouse. Id. at 650, 653.

At trial, Gary W. Powers, a Jacksonville Sheriff's Office evidence technician, identified state's exhibit HH as a blouse found on the floor beside the victim's bed. Ex. 6 at 288. He did not refer to the color of the exhibit. He also mentioned that other items of clothing were taken from the scene and turned into the evidence room for further examination. Id. Diane Hanson, a forensic serologist employed by FDLE, testified that state's exhibit HH, introduced into evidence as state's exhibit 61, was the item tested. Id. at 537. Ms. Hanson said she examined the blouse for the presence of semen. Id. at 538-40. She identified semen on the blouse from a type A secretor, the same type as Petitioner. Id. at 540. Dr. James M. Pollock, Jr., an expert in forensic serology and DNA analysis, testified he extracted DNA from a stain from a turquoise colored blouse, his exhibit number 28I. Id. at 583. He attested

34

that the stain on the blouse matched the DNA profile from Petitioner. <u>Id</u>. at 585, 588, 593.

At the evidentiary hearing, Mr. Powers testified item number 10 was a white blouse with blood stains that was found underneath the victim's head, on the floor. Ex. 38 at 1184-85, Item number 28, however, is labeled clothes found on the bedroom floor. <u>Id</u>. at 1188. Mr. Powers said the blouse at trial "was a white blouse." <u>Id</u>. at 1193. He then stated he assumed it was a white blouse based on the earlier reference to a white blouse being collected at the scene. <u>Id</u>. at 1194. Ms. Zeigler, another FDLE analyst, testified that Dr. Pollock referred to "varieties on green fabric." <u>Id</u>. at 1283.

At the evidentiary hearing, Mr. Tassone testified he had no independent recollection as to the color of exhibit HH, the blouse. <u>Id</u>. at 1356. He attested that in Ms. Hanson's deposition, she identified exhibit 28I as a green blouse, FDLE lab number "quadruple 090404483." <u>Id</u>. at 1426. The state, at the evidentiary hearing, called Dr. Pollock, and he testified that his notes reflect that for exhibit 28I, he examined "a stain on a green fabric[.]" <u>Id</u>. at 1706. Bernardo de la Rionda, the prosecutor, testified at the evidentiary hearing that the exhibit labeled HH, 61, and 28I refers to the green blouse that was an exhibit that came from FDLE referred to as 28I, then marked for identification purposes as HH, and finally introduced into evidence as 61. <u>Id</u>. at 1766. Mr.

35

Rionda attested that he showed the green blouse to Mr. Tassone prior to trial. Id. at 1768.

The state's evidence returned from the FSC lists exhibit HH as a green blouse, introduced as exhibit 61 at trial. Ex. 51 at 4 (Exhibit C, Evidence Cross Reference, State Evidence). Ms. Hanson's April 9, 1991 FDLE death investigation report to the sheriff references exhibit #10 as being a white blouse from under the victim's head on the floor. Id. at 41-42. Exhibit #28 contains multiple items (28A blue skirt, 28B white tissue, 28C plaid shorts, 28D plaid sleeveless top, 28E green skirt, 28F blue, print scarf, 28G white blouse, 28H blue-green blouse, **28I green blouse**, 28J turquoise dress) (emphasis added). Id. at 42-43. More specifically, under exhibit 28I, Ms. Hanson states, "[s]emen was demonstrated on the green blouse recovered from the bedroom floor by the presence of intact non-motile spermatozoa." Id. at 46. Lab # 90404483, item 28I, is listed as a stain from blouse. Id. at 49. The Procedure Data references exhibit 28I. Id. at 50. The Description and Inventory of Evidence written by Dr. Pollock, case no. 90404483, refers to #28I, a cutting from blouse, further described as "varieties on green fabric[.]" Id. at 65.

In Dr. Pollock's deposition, he references item 28 INDIA. Id. at 89, 91, 105. His death investigation report to the sheriff, dated July 17, 1991, refers

36

to #28I as the "stain from blouse." Id. at 110-11. Mr. Powers' Evidence Technician Report lists #10 as a white blouse with blood stains under victim's head on floor and # 28 as assorted clothing from bedroom floor. Id. at 215.

Under these circumstances and based on the record, Mr. Tassone was not ineffective for failure to file a motion in limine to suppress the blouse or object to the lack of foundation and a break in the chain of custody. Indeed, he cannot be deemed ineffective for failure to develop a theory that the white blouse with blood stains found at the scene was introduced into evidence, but forensic testing was actually performed on a green or turquoise blouse.

The purported theory that the white blouse was the one the witnesses referred to in their testimony and the court entered into evidence at trial is primarily based on the fact that Mr. Tassone and Mr. de la Rionda did not refer to the color of the blouse when they examined witnesses at trial and Mr. Powers' evidentiary hearing testimony that the white blouse was introduced at trial or he assumed it was the white blouse. The record demonstrates that exhibit HH, 61, and 28I, were all used as identifiers for the green blouse/green fabric, the evidence introduced at trial to support Petitioner's conviction. When the evidence was returned from the FSC, it was referred to as exhibit HH, a green blouse, introduced as exhibit 61 at trial. The Court will give deference to the factual finding of the state court as it has not been rebutted

by clear and convincing evidence. Moreover, under these circumstances, defense counsel was not ineffective for failure to develop the "white blouse" theory as the evidence overwhelmingly showed that the witnesses were referring to the green blouse or green fabric as being the source of the semen and DNA evidence used against Petitioner at trial. As such, Mr. Tassone was not ineffective based on any failure to file a motion in limine to suppress the blouse or object to the lack of foundation or break in a chain of custody of the blouse introduced at trial.

The Court concludes counsel's performance was not constitutionally deficient under the circumstances presented to counsel in 1991 and Petitioner is not entitled to habeas relief. Mr. Tassone performed reasonably, well within the scope of permissible performance. Perfection is not the standard. Mr. Tassone conducted a voir dire examination of Dr. Pollock, vigorously cross examined Dr. Pollock, made a reasoned, strategic decision not to call Dr. Goldman after conferring with Dr. Goldman about the DNA evidence, was well prepared for trial, did not perform deficiently for failure to request a Richardson hearing as there was no discovery violation, or for failure to file a motion in limine to suppress the blouse or object to lack of foundation or chain of custody of the blouse introduced at trial, or for failure to request a Frye hearing.

Of course, in hindsight counsel could have done things differently or done more. Although every attorney may not have chosen the same approach or strategy, Mr. Tassone's performance did not so undermine the proper functioning of the adversarial process that Petitioner was deprived of a fair trial.[16] This Court has opined:

> "To state the obvious: the trial lawyers, in every case, could have done something more or something different. So, omissions are inevitable. But, the issue is not what is possible or 'what is prudent or appropriate, but only what is constitutionally compelled.'" Chandler v. United States, 218 F.3d 1305, 1313 (11th Cir.2000) (quoting Burger v. Kemp, 483 U.S. 776, 794, 107 S. Ct. 3114, 97 L.Ed.2d 638 (1987)). In finding prejudice, the court must determine that the result of the proceedings would have been different considering "the totality of the evidence before the judge or jury." Berghuis v. Thompkins, —— U.S. ——, 130 S. Ct. 2250, 2265, 176 L.Ed.2d 1098 (2010) (quoting Strickland, 466 U.S. at 695).

---

[16] The Fourteenth Amendment provides any state shall not deprive any person of life, liberty, or property, without due process of law. U.S. Const. amend. 14. To the extent a Fourteenth Amendment claim was raised and addressed, the adjudication of the state court resulted in a decision that involved a reasonable application of clearly established federal law, as determined by the United States Supreme Court. Therefore, Petitioner is not entitled to relief on this Fourteenth Amendment claim because the state court's decision was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts based on the evidence presented in the state court proceedings. Therefore, AEDPA deference is due, or alternatively, Petitioner is not entitled to federal habeas relief on this Fourteenth Amendment claim.

Kuhns v. Sec'y Dep't of Corr., No. 2:08-cv-163-FtM-29SPC, 2011 WL 1085013, at *6 (M.D. Fla. Mar. 21, 2011) (not reported in F.Supp.2d).

The Court finds the state court's determination is consistent with federal precedent. The state court's decision is entitled to AEDPA deference. The state court's ruling is based on a reasonable determination of the facts and a reasonable application of the law. In short, the state court's adjudication of the claim is not contrary to or an unreasonable application of Strickland and its progeny or based on an unreasonable determination of the facts. Therefore, the state court's decision is entitled to deference and ground two is due to be denied.

As the threshold standard of Strickland has not been met, Petitioner has failed to demonstrate that his trial was fundamentally unfair and his counsel ineffective. Thus, he has failed to demonstrate Sixth or Fourteenth Amendment violations.

The remaining question is whether Petitioner has shown an Eighth Amendment violation. Barbaric punishments are prohibited under the Eighth Amendment. Of import, "[t]he Eighth Amendment states: 'Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.'" Graham v. Florida, No. 08-7412, 2010 WL 1946731, at *7 (2010). Other than mentioning the Eighth Amendment to the United

States Constitution in the statement setting forth Ground II, Petition at 44, Petitioner does not mention or attempt to support an Eighth Amendment claim.

The Court finds the Eighth Amendment claim under the claim of ineffective assistance of counsel at the guilt phase of the capital proceedings raised in ground two both vague and conclusory.   Notably, Petitioner does not address the penalty phase of the state court proceedings in this ground.   He only relies on the guilt phase of the capital proceeding, and he raises the Eighth Amendment claim in a summary fashion.   Without more, Petitioner cannot prevail on this Eighth Amendment claim.   Therefore, the Eighth Amendment claim raised in ground two is due to be denied.

## VIII.   GROUND THREE

**Ground Three:   Mr. Taylor was denied the effective assistance of counsel at the penalty phase of his capital trial, in violation of his rights to due process and equal protection under the United States Constitution, as well as his rights under the Fifth, Sixth and Eighth Amendments.**

In this ground, Petitioner claims his counsel provided ineffective assistance in violation of the Sixth Amendment because he never presented a wealth of mitigation due to an inadequate investigation.   Petition at 66.   As such, Petitioner claims he was "deprived of the full impact of substantial and compelling statutory and nonstatutory mitigating evidence."   Id. (footnote

omitted).    In  this  regard,  Petitioner  contends,  "because  counsel  failed  to
undertake  an  adequate  investigation,  counsel  was  unable  to  provide  mental
health  experts  with  background  information  essential  to  making  an  accurate
diagnosis and assessment of Mr. Taylor's mental state."    Id. at 72.    Therefore,
Petitioner  opines,  counsel's  alleged  failure  to  discover  Petitioner  had  the
problem-solving  ability  and  emotional  age  of  a  thirteen-year-old,  suffers  from
impaired neurological development, is a chronic alcohol and drug abuser, has
undiagnosed  attention  deficit  disorder,  and  suffers  from  organic  brain
syndrome resulted in constitutionally inadequate psychiatric evaluations by
court  appointed  experts.    Id. at 72-73.    In sum, Petitioner claims he suffered
prejudice  based  on  his  counsel's  failure  to  investigate  and  prepare  for  the
penalty phase of the capital trial.    Id. at 73.

The  Fifth  Amendment  provides:    "[n]o  person  shall  .  .  .  be  deprived  of
life, liberty, or property, without due process of law[.]"    U.S. Const. amend. V.
The Fifth Amendment's due process protection applies to the states by virtue
of the Fourteenth Amendment.    U.S. Const. Amends. 5, 14.    The Court first
notes that Petitioner completely fails to provide support for claims under either
the  Fifth  or  Eighth  Amendments  in  his  Petition.    Even  liberally  construing
ground  three,  it  only  presents  allegations  supporting  a  claim  of  ineffective
assistance of counsel under the Sixth Amendment.    The Memorandum does

not present any Fifth Amendment or Eighth Amendment claims. Therefore, the Court finds Petitioner is not entitled to federal habeas relief under either the Fifth or Eighth Amendments in this claim of ineffective assistance of counsel at the penalty phase of his capital trial.

Petitioner does raise a Sixth Amendment claim of ineffective assistance of counsel; however, he faces overwhelming procedural hurdles in that Petitioner's post-conviction counsel expressly withdrew this claim at the post-conviction evidentiary hearing in Petitioner's presence, without objection or exception being made by Petitioner.

The record demonstrates the following. Petitioner was present at the post-conviction evidentiary hearing. Ex. 38 at 1146. Michael P. Reiter,[17] post-conviction counsel for Petitioner, announced the following:

> MR. REITER: **Judge, I had indicated I spoke to my client and indicated to the State there are some claims in the 3.850 that we will be withdrawing. Two of them – actually we have been granted evidentiary hearing on**, the rest are basically legal arguments, claim, six, paragraphs two through eight, the rest we will be keep of six –

---

[17] Petitioner puts some emphasis on the fact that Mr. Reiter, who represented Petitioner at the post-conviction evidentiary hearing, was not the same attorney who originally pled the ineffective assistance of counsel at the penalty phase claim. Memorandum at 38 n.20. The record demonstrates that is the case. Ex. 33. However, the record also shows that Robert A. Harper, who originally pled the claim, certified there was a conflict with his client, and moved to withdraw as counsel. Ex. 34 at 943-44, 946. The court granted the motion and, upon request, substituted Mr. Reiter as counsel. Id. at 948.

THE COURT: Two, three, four, five, six, seven and eight.

MR. REITER: I'm withdrawing.

THE COURT: Okay.

MR. REITER: Claim seven, experts, withdrawn, claim eight, instruction to reasonable doubt, withdrawn.

THE COURT: Hold on.

MR. REITER: **Claim nine, ineffective assistance of counsel for penalty phase withdrawn**. Claim ten, will be withdrawn on the condition Mr. De la Rionda reserves to the court that his office did not draft the sentencing order.

MR. DE LA RIONDA: I can address that at this time, the State Attorney's Office did not draft any sentencing order.

THE COURT: Okay.

MR. REITER: Claim 14, mercy instruction, and claim 18, judge failed to file mitigation withdrawn.

Id. at 1147-48 (emphasis added).

Mr. Reiter represented that he had spoken with his client and they wished to withdraw the claim of ineffective assistance of counsel for the penalty phase. Petitioner was present when Mr. Reiter announced the decision to the court and Petitioner did not express any opposition to the announcement or

44

delineate any exceptions to the announcement. A defendant has an affirmative duty to speak up if his attorney is stating something on the record other than what had been agreed upon prior to the proceeding. See e.g. Singfield v. State, 74 So. 3d 127, 129 (Fla. 2nd DCA Sept. 23, 2011) (per curiam) (once advised of probable sentence, a defendant has a duty to speak up if his attorney promised something different). Apparently, Petitioner is now second-guessing the decision to abandon this ground and desires to raise a claim that he discussed with counsel and decided to withdraw at the state post-conviction proceeding.

At this stage, the claim is unexhausted and procedurally defaulted. The record shows Petitioner affirmatively abandoned this claim. Furthermore, the matter was not taken up on appeal to the FSC, further evincing abandonment. See Atwater v. Crosby, 451 F.3d 799, 810 (11th Cir. 2006) (a petitioner abandons a claim when he receives an evidentiary hearing and fails to raise the claim in a brief on appeal), cert. denied, 549 U.S. 1124 (2007); Baker v. Dep't of Corr., Sec'y, 634 F. App'x 689, 692 (11th Cir. 2015) (per curiam) (same). Thus, Petitioner failed to give the state courts one full opportunity to resolve the constitutional issue "by invoking one complete round of the State's established appellate review process." O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999).

The state courts should have the first opportunity to address and correct alleged constitutional violations, and here, Petitioner deprived the state courts of this opportunity by not pursuing his claim and presenting evidence to support the claim at the evidentiary hearing, although he had been provided that opportunity. Respondents aver, Petitioner "expressly abandoned this claim in state court." Response at 96 (footnote omitted). Respondents assert it would be a gross abuse of the writ to allow Petitioner to expressly abandon a claim that he was granted an evidentiary hearing on, which the state court did not hear at the evidentiary hearing, and then allow Petitioner to re-raise the claim at a later juncture. Response at 98-99.

This is a paradigm abuse of the writ. Petitioner raised the claim in his Rule 3.851 motion and then, on the record, through counsel, announced abandonment of the claim. Wong Doo v. United States, 265 U.S. 239 (1924) (after deliberate abandonment and the failure to present evidence on a claim, an attempt to reassert the claim constituted an abuse of the writ). See Watson v. FCC Coleman-USP I, 644 F. App'x 996, 1000 (11th Cir. 2016) (per curiam) (finding abuse of the writ when a petitioner fails to raise a claim "despite his knowledge of its existence"). When there has been deliberate abandonment, equities are different. Bracken v. Dormire, 247 F.3d 699, 706 (8th Cir. 2001) (citing Wong Doo). See Williams v. Sec'y for the Dep't of Corr., 130 F. App'x

296, 297 (11th Cir. 2005) (per curiam) (equating intentional abandonment, deliberate withholding, and inexcusable neglect under the abuse of the writ doctrine).

"AEDPA modifies those abuse-of-the-writ principles and creates new statutory rules under § 2244(b)[,]" Magwood v. Patterson, 561 U.S. 320, 337 (2010), but "[t]he design and purpose of AEDPA is to avoid abuses of the writ of habeas corpus, in recognition of the potential for the writ's intrusive effect on state criminal justice systems." Id. at 344 (Kennedy, J., dissenting). The burden is on the government to plead abuse of the writ, Sanders v. United States, 373 U.S. 1, 10-11 (1963), and here, the state has adequately pled that Petitioner abused the writ. And, importantly, 28 U.S.C. § 2244 "was obviously not intended to foreclose judicial application of the abuse-of-writ principle as developed in Wong Doo . . . ." Id. at 12.

It is difficult for this Court to consider Petitioner's decision as anything other that deliberate abandonment of a claim at the evidentiary hearing; "[n]othing in the traditions of habeas corpus requires the federal courts to tolerate needless piecemeal litigation, to entertain collateral proceedings whose only purpose is to vex, harass, or delay." Id. at 18. The burden to disprove abuse shifts to a petitioner once the government has stated with clarity and particularity the claim of abuse of the writ. See, e.g., Lucy v.

<u>Boutwell</u>, No. Civ.A. 98-1281-RV-M, 2000 WL 829364, at *1 (S.D. Ala. May 25, 2000) (not reported in F.Supp.2d) (once pleaded, the burden shifts to the petitioner) (quotation and citation omitted).

As Respondents have adequately contended that Petitioner's delayed presentation of his claim constitutes an abuse of the writ, Petitioner bears the burden of satisfying this Court that the delay is excusable. To excuse failure to pursue a claim earlier, a petitioner must show cause and prejudice or that a fundamental miscarriage of justice will result if the claim is not addressed on its merits. <u>See</u> <u>Johnson v. La. Dep't of Corr.</u>, No. 19-13554, 2020 WL 5899009, at *9 (E.D. La. Aug. 4, 2020) (petitioner required to demonstrate cause and prejudice or a fundamental miscarriage of justice will occur if claim not considered), <u>report and recommendation adopted by</u> 2020 WL 5889336 (E.D. La. Oct. 5, 2020). In footnotes, Petitioner summarily references the state's contention of abandonment and abuse of the writ, <u>see</u> Reply at 24-25 (fn. 14 & fn. 15), but Petitioner focuses almost entirely on his contention that inadequate post-conviction counsel caused procedural default, apparently in an attempt to evade the more difficult question of abandonment. Reply at 24-25.

Obviously, Petitioner knew the factual predicate of the claim as it was raised in the post-conviction motion. Not only was the claim actually raised in the post-conviction motion, Petitioner was granted an evidentiary hearing

on the claim. <u>Wong Doo</u>, 265 U.S. at 241 ("if he was intending to rely on that ground, good faith required that he produce the proof then"). Petitioner was not prevented from raising the claim; he abandoned it. Not only has cause and prejudice not been adequately demonstrated, "a fundamental miscarriage of justice will not be visited upon Petitioner if the merit of [this claim] is not addressed." <u>Lucy</u>, 2000 WL 829364, at *3. Therefore, this claim is due to be dismissed for abuse of the writ.

Alternatively, the Court will address the issue of procedural default. The claim raised in ground three is unexhausted and procedurally defaulted. The doctrine of procedural default requires the following:

> Federal habeas courts reviewing the constitutionality of a state prisoner's conviction and sentence are guided by rules designed to ensure that state court judgments are accorded the finality and respect necessary to preserve the integrity of legal proceedings within our system of federalism. These rules include the doctrine of procedural default, under which a federal court will not review the merits of claims, including constitutional claims, that a state court declined to hear because the prisoner failed to abide by a state procedural rule. <u>See</u>, <u>e.g.</u>, <u>Coleman</u>,[18] <u>supra</u>, at 747-748, 111 S. Ct. 2546; <u>Sykes</u>,[19] <u>supra</u>, at 84-85, 97 S. Ct. 2497. A state court's invocation of a procedural rule to deny a prisoner's claims precludes federal review of the claims if, among other requisites, the state procedural rule is a nonfederal ground

---

18  <u>Coleman v. Thompson</u>, 501 U.S. 722 (1991).

19  <u>Wainwright v. Sykes</u>, 433 U.S. 72 (1977).

> adequate to support the judgment and the rule is
> firmly established and consistently followed. <u>See</u>, <u>e.g.</u>,
> <u>Walker v. Martin</u>, 562 U.S. ----, ----, 131 S. Ct. 1120,
> 1127-1128, 179 L.Ed.2d 62 (2011); <u>Beard v. Kindler</u>,
> 558 U.S.----, ----, 130 S. Ct. 612, 617-618, 175 L.Ed.2d
> 417 (2009). The doctrine barring procedurally
> defaulted claims from being heard is not without
> exceptions. A prisoner may obtain federal review of a
> defaulted claim by showing cause for the default and
> prejudice from a violation of federal law. <u>See</u> <u>Coleman</u>,
> 501 U.S., at 750, 111 S. Ct. 2546.

<u>Martinez v. Ryan</u>, 566 U.S. 1, 9-10 (2012).

A petition for writ of habeas corpus should not be entertained unless the petitioner has first exhausted his state court remedies. <u>Castille v. Peoples</u>, 489 U.S. 346, 349 (1989); <u>Rose v. Lundy</u>, 455 U.S. 509 (1982). A procedural default arises "when 'the petitioner fails to raise the [federal] claim in state court and it is clear from state law that any future attempts at exhaustion would be futile.'" <u>Owen v. Sec'y, Dep't of Corr.</u>, 568 F.3d 894, 908 n.9 (11th Cir. 2009) (quoting <u>Zeigler v. Crosby</u>, 345 F.3d 1300, 1304 (11th Cir. 2003)), <u>cert. denied</u>, 558 U.S. 1151 (2010).

There are, however, allowable exceptions to the procedural default doctrine; "[a] prisoner may obtain federal review of a defaulted claim by showing cause for the default and prejudice from a violation of federal law." <u>Martinez</u>, 566 U.S. at 10 (citing <u>Coleman</u>, 501 U.S. at 750). To demonstrate cause, a petitioner must show some objective factor external to the defense

impeded his effort to properly raise the claim in state court. <u>Wright v. Hopper</u>, 169 F.3d 695, 703 (11th Cir.), <u>cert. denied</u>, 528 U.S. 934 (1999). If cause is established, a petitioner must demonstrate prejudice. To demonstrate prejudice, a petitioner must show "there is at least a reasonable probability that the result of the proceeding would have been different had the constitutional violation not occurred." <u>Owen</u>, 568 F.3d at 908.

Alternatively, a petitioner may obtain review of a procedurally barred claim if he satisfies the actual innocence "gateway" established in <u>Schlup v. Delo</u>, 513 U.S. 298 (1995). The gateway exception is meant to prevent a constitutional error at trial from causing a miscarriage of justice and conviction of the actually innocent. <u>Kuenzel v. Comm'r, Ala. Dep't of Corr.</u>, 690 F.3d 1311, 1314 (11th Cir. 2012) (per curiam) (quoting <u>Schlup</u>, 513 U.S. at 324), <u>cert. denied</u>, 569 U.S. 1004 (2013).

Petitioner relies on <u>Martinez</u> and asks that the default of ground three be excused pursuant to <u>Martinez</u>. Per <u>Martinez</u>, this Court must ask whether a petitioner has satisfied the standard for excusing a default. As Petitioner had post-conviction counsel, Petitioner must show his post-conviction counsel provided ineffective assistance of counsel by failing to pursue this ground at the evidentiary hearing and Petitioner must establish that the underlying claim of ineffective assistance of counsel is substantial.

Martinez provides a narrow, equitable, non-constitutional exception to the holding in Coleman. To the extent Petitioner claims his procedural default should be excused based on the narrow exception under Martinez, Petitioner must demonstrate the underlying ineffectiveness claim is substantial. Petitioner has failed to establish his claim is "substantial." To meet this requirement, Petitioner must demonstrate the claim has some merit. Martinez, 566 U.S. at 14. In this instance, the underlying ineffectiveness claim raised in ground three lacks merit; therefore, Petitioner has not demonstrated he can satisfy an exception to the procedural bar. To explain, the Court provides a merits analysis.

Based on a thorough review of the complete record, Petitioner's underlying claim of ineffective assistance of counsel for failure to conduct a thorough investigation in order to adequately prepare for the penalty phase of the capital trial lacks merit. See Petition at 66. Petitioner alleges counsel failed to discover Petitioner had the problem-solving ability and emotional age of a thirteen-year-old, suffers from impaired neurological development, is a chronic alcohol and drug abuser, has undiagnosed attention deficit disorder, and suffers from organic brain syndrome. Petitioner claims as a result of counsel's inadequate investigation, constitutionally inadequate psychiatric evaluations by court appointed experts followed.

The record shows defense counsel participated in discovery and prepared for trial, including the penalty phase. Mr. Tassone filed a Motion for Appointment of Expert to Assist Counsel in the Preparation of the Defense of Insanity. Ex. 1 at 73-74. In the body of the motion, counsel stated he believed there were sufficient grounds to obtain an expert to assist counsel in determining whether Petitioner's competency to stand trial or insanity at the time of the offense. Id. at 73. The trial court entered an Order Granting Confidential Psychiatric Evaluation of Defendant, appointing Dr. Louis Legum as a qualified expert to examine Petitioner to make numerous determinations, such as whether Petitioner met the criteria for involuntary hospitalization; "the nature and extent of the mental illness or mental retardation suffered by the Defendant;" whether Petitioner is mentally ill and due to his illness is likely to injure himself or others or need particular care; whether Petitioner is incompetent to stand trial but may return to competence within the foreseeable future; and whether Petitioner was insane at the time of the commission of the crime, including whether he was suffering from a mental illness that inhibited his ability to understand the nature, quality and wrongness of his acts. Id. at 75-77. The court directed that Dr. Legum's report be confidential and submitted only to defense counsel. Id. at 76.

After the guilt phase, Mr. Tassone filed another motion for appointment of an expert to assist counsel.  Ex. 2 at 251-52.  He stated he believed there were "sufficient grounds to employ an expert to assist counsel in determining whether Defendant meets the criteria of any statutory or non-statutory mitigating factors."  Id. at 251.  Mr. Tassone asked the court to grant the motion and appoint an expert to assist in the preparation of the jury's advisory opinion on sentence.  Id. at 251-52.  The court, in response, entered an Order Granting Confidential Psychiatric Evaluation of Defendant.  Id. at 253-55. The court found reasonable grounds to appoint Dr. Harry Krop to advise counsel as to whether Petitioner may meet the criteria for statutory and/or non-statutory mitigating factors.  Id. at 253.  The court appointed Dr. Krop to advise counsel "and perhaps the jury whether sufficient aggravating circumstances exist to justify the imposition of the death penalty and whether sufficient mitigating circumstances exist to outweigh any aggravating circumstances found to exist[.]"  Id.  Among other things, the court directed that the expert consider whether Petitioner was under the influence of extreme mental or emotional disturbance, whether he was a relatively minor participant, whether he acted under extreme duress or domination of another, whether he had the capacity to appreciate the criminality of his conduct or whether his ability to conform was substantially impaired, and whether the

defendant's age and any other aspect of his character or record, and any other circumstances of the offense should be taken into consideration.[20] Id. at 253-54.

The record reflects that Mr. Tassone strategically selected certain witnesses to testify on behalf of Petitioner at the penalty phase. Of course, Mr. Tassone read or heard the content of the confidential examinations of Dr. Legum and Dr. Krop, but Mr. Tassone elected not to call the doctors as witnesses during the penalty phase or reveal the content of their examinations. Instead, Mr. Tassone called Charles Miles, a childhood neighbor; Lloyd King, Petitioner's uncle; Judy Rogers, a family friend who testified that she thought Petitioner had a learning disability; Don King, an uncle who testified that Petitioner experienced difficulty in reading and reading comprehension and

---

20   The record demonstrates, after the penalty phase testimony, Mr. Tassone filed a Response to Pre-Sentence Investigation Report (PSI).   Ex. 18 (Volume 1) at 267-69.   He said 'it would seem extremely appropriate that evidence of the Defendant's educational history, including any psychological test scores and any evidence of alcohol/substance abuse be included" in the PSI, especially after Petitioner's mother provided information to the probation officer.   Id. at 267-68.   Mr. Tassone also asked that evidence of retardation be appended to the PSI, particularly in light of the testimony at the penalty phase of the trial, and that the records made available to the probation officer from Gateway Community Services and Alcoholic Anonymous be taken into consideration.   Id.   Mr. Tassone also submitted to the court a Sentencing Memorandum Regarding Mental or Emotional Disturbance asking the court to consider the existence of any mental disturbance as a significant non-statutory mitigating factor despite the fact that Petitioner was not found to be legally insane or under extreme mental or emotional disturbance but in recognition that he has an I.Q. of approximately 68 and the mental maturity of between 13 and 15 years of age.   Id. at 270-72.

was a very passive person; and Lenette Taylor, Petitioner's adoptive mother, who attested to Petitioner's difficulties in school and her lack of success in getting Petitioner into special education classes, to his passiveness, and to his IQ being in the range from 68 to 70, the mildly retarded range. Ex. 14 at 804-30.

Of import, Ms. Taylor testified that Petitioner had difficulty concentrating, sitting still in class, and paying attention to teachers. Id. at 824. Ms. Taylor testified she participated in psychological or psychiatric screenings of Petitioner and both psychologists told her Petitioner's IQ was between 68 and 70, the mildly retarded range, and that his maturity age was approximately 14 years of age and his actual chronological age is 22. Id. at 827. On cross-examination, when asked if she was told by Mr. William Dando, a psychology specialist, that Petitioner was functioning in the average intelligence range, she said yes, but that Dr. Krop, the psychologist who recently examined Petitioner, advised Ms. Taylor that those test results were wrong. Id. at 829-30.

Of import, Mr. Tassone announced on the record the defense's decision not to call Dr. Legum and Dr. Krop (also referred to as Dr. Leggum and Dr. Kropp in the record):

Your Honor, I would advise and I apologize to Mr. de la Rionda because I told him I'd call him last night and failed to but I advised him this morning that Mr. Taylor was examined by Dr. Leggum, 60 or 90 days ago and I was provided a confidential report of that examination. He was also examined by Dr. Larry [sic] Kropp and both doctors, Leggum and Kropp, are psychologist [sic] and I conferred with both Dr. Leggum and Dr. Kropp, probably for a period of about ten to 15 hours over the last two days and including up until 10 or 10:30 last night. Based on what Dr. Kropp and Dr. Leggum told me, it was – I concluded after agonizing over the decision that I would not use Dr. Kropp nor Dr. Leggum in the course of the penalty phase of these proceedings.

Dr. Kropp advised me he had sufficient time to examine Mr. Taylor and that he performed whatever test he deemed appropriate within his field of expertise to reach certain conclusions and while he had not prepared a written report he gave me at least an hour and half or two hour verbal report and we discussed the same back and forth.

**I advised Mr. Taylor this morning and his parents last night and this morning that it was my opinion that neither of the doctors should be called and they did not object to that recommendation and essentially concurred in that recommendation.**

Id. at 836-37 (emphasis added).

As noted by the FSC, Mr. Tassone "determined that it would be in Taylor's best interest for neither expert to testify." Taylor v. State, 630 So. 2d at 1043. Upon review, counsel's performance was well within the broad range

of reasonable assistance under prevailing professional norms.   Strickland.
The decision as to whether to present certain witnesses is a strategic one, left
within counsel's domain.   Chaflin v. Sec'y, Dep't of Corr., No. 6:09-cv-2055-
ORL-31KRS, 2011 WL 280940, at *3 (M.D. Fla. Jan. 26, 2011) (not reported in
F.Supp.2d).   Indeed, counsel is given wide latitude in making these type of
strategic decisions, and in this instance, counsel's performance did not fall
outside the norm.

The record shows counsel wrestled with the decision as to whether to call
the confidential experts, vetted the matter after reviewing and discussing
written and verbal reports, discussed the matter with Petitioner and his
parents, and ultimately decided not to call the confidential experts, with his
client's concurrence in the decision.[21]   Mr. Tassone, however, was able to
convince the court to find Petitioner was mildly retarded through the
testimony of Ms. Taylor who testified as to Petitioner's IQ scores, revealed the
content of her discussions with the examining doctors, and provided Dr. Krop's
assessment that Petitioner's responses were not in the average intelligence

---

21 This was not a rash decision.   It was a deliberate decision made after a thorough
assessment of the pros and cons of calling two experts who would be, if they took the stand,
thoroughly cross-examined by the prosecutor.   By using Ms. Taylor to present evidence of
passivity, attention deficit problems, learning difficulties, and mental retardation, defense
counsel avoided the perceived pitfalls of calling the experts.

range. Thus, counsel was able, through his strategy of having Ms. Taylor present the evidence of Petitioner's intellectual disability, to obtain a ruling by the trial court that Petitioner was "mildly retarded' and that his mild retardation was a non-statutory mitigating factor. Taylor v. State, 630 So. 2d at 1043. The judge, however, decided to give this factor slight weight, noting Petitioner was functioning as an adult as he lived away from his parental home, engaged in adult occupations, and was the father of a child.[22] Id. Petitioner has not alleged or shown otherwise.

Petitioner claims counsel failed to provide Petitioner with "a competent psychiatrist to conduct an appropriate examination and assist in evaluation, preparation, and presentation of a defense." Ake v. Oklahoma, 470 U.S. 68,

---

[22] Petitioner's assertion that counsel failed to discover Petitioner had the problem-solving ability and emotional age of a thirteen-year-old is belied by the record. Counsel was well aware that Petitioner's emotional age was considered to be well below his actual age as Ms. Taylor attested to that factor. Petitioner's contention that counsel failed to discover Petitioner's impairments is also belied by the record. Two mental health experts examined Petitioner, performed tests, and provided confidential reports to defense counsel. In his assessment, Dr. Legum was to include an analysis of the nature and extent of any mental illness or mental retardation suffered by Petitioner, his competency, and his sanity at the time of the crime. Ex. 1 at 75-77. In his assessment, Dr. Krop was appointed to analyze whether Petitioner committed the crime while under the influence of extreme mental or emotional disturbance, whether Petitioner was under extreme duress or domination, whether he was substantially impaired, and any other relevant aspects of his character. Ex. 2 at 253-55. Mr. Tassone stated he obtained written or verbal reports from the experts, he spent hours reviewing and discussing these reports, and ultimately, decided not to call the experts after conferring with his client and his client's parents.

83 (1985). <u>See</u> Memorandum at 38. Petitioner also contends the psychiatric evaluations were "constitutionally inadequate." Petition at 72.

Mr. Tassone asked for and obtained the appointment of two confidential experts to aid the defense. The court appointed well-qualified experts who were directed to make thorough mental health assessments and provide their analysis to the defense. After providing their reports, the doctors assisted counsel in evaluation and preparation. Mr. Tassone reasonably relied on the doctors' expertise and assessments to make his decisions in preparation of the penalty phase of the capital trial.

Mr. Tassone could reasonably rely on the appointed experts to make an adequate diagnosis and assessment whether Petitioner was suffering from any mental illness or infirmity, which could include neurological impairments, an attention deficit disorder, or organic brain syndrome.[23] Certainly, Dr. Legum,

---

23 Curiously, Petitioner mentions "undiagnosed attention deficit disorder." Petition at 73. If this disorder were undiagnosed, such diagnosis would not have been discoverable through a more intensive background investigation. Petitioner's adopted mother, called by defense counsel, testified at the penalty phase as to Petitioner's difficulties in school, including a lack of concentration, inability to sit still, and trouble paying attention in class. Ex. 14 at 824. Thus, evidence of Petitioner's undiagnosed attention deficits was adequately presented at the penalty phase of the trial though Ms. Taylor's testimony. As far as neurological impairment and organic brain syndrome, since the doctors' reports remain confidential, the record does not show if any screening tests produced results which were consistent with a finding of organic brain damage. <u>Raheem</u>, 2021 WL 1605939, at *12. The record does show the court appointed experts to assess whether Petitioner was suffering from a mental illness that inhibited his ability to understand the nature, quality and wrongness of his acts and whether he had the capacity to appreciate the criminality of his conduct or whether his ability to conform was substantially impaired. Therefore, defense counsel would have been advised by the appointed experts whether Petitioner had significant problems with judgment, was

in determining whether Petitioner met the criteria for involuntary hospitalization or whether his mental state prevented his ability to understand the nature, quality and wrongness of his acts, would likely have taken into consideration any alcohol and/or drug issues. Dr. Krop, who was directed to consider whether Petitioner was under the influence of "extreme mental or emotional disturbance," also would have had occasion to consider alcohol and drug impairment or addictions. Obviously, Mr. Tassone had spoken with Ms. Taylor, Petitioner's adopted mother, in order to prepare for the penalty phase, and she attested to Petitioner's mild retardation, passivity, attention deficits, and the recommendation of the school psychologist that Petitioner be admitted into special education classes.[24] Ex. 14 at 824-27.

---

unable to control his behavior, or lacked the ability to understand the world around him. Also, it is significant that neither doctor found Petitioner incompetent or insane, and Petitioner does not now suggest that he was either incompetent or insane.

24 Apparently, Ms. Taylor was aware of Petitioner's alcohol and substance abuse, demonstrated by her ability to provide information concerning alcohol and drug abuse to the probation officer during the investigation for the PSI. Ex. 18 (Volume 1) at 267-68. Based on Ms. Taylor's testimony, it is quite apparent Mr. Tassone communicated with Ms. Taylor prior to the penalty phase of the trial. The record also demonstrates Petitioner did not come from "a home rife with abuse, neglect, and trauma at the hands of his . . . caregivers." Lee, 2021 WL 507897, at *7. Indeed, the record shows he came from a loving adopted home with caring, educated parents who tried to get him the special education and attention he needed as he was mildly retarded and struggled with attention issues; therefore, Mr. Tassone chose to focus heavily on evidence of Petitioner's intellectual disabilities and passiveness during the penalty phase before the jury.

Failing to demonstrate Mr. Tassone's performance was deficient, Petitioner has failed to show the underlying claim has some merit. Based on the above, Petitioner has failed to show he falls within the narrow parameters of the ruling in <u>Martinez</u>, in which the Supreme Court recognized a narrow exception for ineffective assistance of counsel/absence of counsel at initial-review collateral proceedings. Since Petitioner has failed to demonstrate the underlying ineffective assistance of counsel claim is a substantial one, he does not fall within the narrow exception. <u>See</u> <u>Clark v. Comm. Ala. Dep't of Corr.</u>, No. 19-11443, 2021 WL 727183, at *3 (11th Cir. Feb. 25, 2021) ("<u>Martinez</u> is of no help because [Petitioner] has not presented a 'substantial claim' that his trial counsel rendered ineffective assistance[.]") Thus, he has failed to establish cause for the procedural default of this claim of ineffective assistance of counsel raised in ground three.

Finally, and alternatively, this Court will not deem an attorney's performance deficient for abandoning a claim that Petitioner agreed to abandon. <u>See</u> <u>Kuhns</u>, 2011 WL 1085013, at *3 ("At the evidentiary hearing, Petitioner, represented by counsel, agreed to abandon claim[.]"). The state court did not address Petitioner's claim because "it had been abandoned." <u>McGuire v. Warden, Chillicothe Corr. Inst.</u>, 738 F.3d 741, 747 (6th Cir. 2013) (district court did not address the claim as it was abandoned), <u>cert. denied</u>, 571

U.S. 1161 (2014). After announcing abandonment of the claim at the evidentiary hearing, Petitioner did not raise the issue on appeal of the denial of the post-conviction motion, argue that he had no intention of abandoning the claim, or claim that he did not agree with the decision to abandon the claim, further evincing his intentional abandonment of the claim.

Petitioner has failed to show cause for his default of ground three, and he does not meet the prejudice or manifest injustice exceptions. Upon review, Petitioner has failed to identify any fact warranting the application of the fundamental miscarriage of justice exception. Therefore, the Court finds ground three is unexhausted and procedurally defaulted. As Petitioner has failed to establish cause and prejudice or any factors warranting the application of the fundamental miscarriage of justice exception to overcome the default, the court deems the claim of ineffective assistance of counsel at the penalty phase procedurally defaulted, and Petitioner is procedurally barred from raising the unexhausted claim raised in ground three in this habeas proceeding.

## IX.   GROUND FOUR

**Ground Four:   The court erred in denying Mr. Taylor's motion to suppress statements made to a police officer while in custody and after Mr. Taylor had invoked his rights to counsel in violation of the Fifth and Sixth Amendments to the United States Constitution.**

Petitioner raised this claim on direct appeal to the FSC. Ex. 21 at 8-12. The FSC rejected Petitioner's argument finding the trial court did not err in overruling Petitioner's objection. The FSC opined:

> In his first claim, Taylor argues that the trial judge erred in allowing evidence concerning the statements he made to the investigating officer after the blood samples were taken from Taylor. Taylor argues that he had invoked his right to counsel under the Sixth Amendment of the United States Constitution and his right to remain silent under the Fifth Amendment of the United States Constitution. Taylor argues that, even though he had not been formally arrested, he was not free to leave the jail while the blood and saliva samples were being taken. Furthermore, Taylor asserts that, although he was not being interrogated, the police officer's reply to his question regarding how long it would take to get the test results back was inappropriate and designed to elicit a response.
>
> We reject this argument under the circumstances of this case and find that the trial judge did not err in overruling Taylor's objection. The record establishes that, although Taylor was not free to leave until after the samples were taken, he was not under arrest; that Taylor initiated the conversation; and, more importantly, that Taylor made the statements in question *after* the samples had been taken and he was free to leave. We find that the constitutional right to counsel under both the United States and Florida Constitutions does not attach under these circumstances. Moran v. Burbine, 475 U.S. 412, 106 S. Ct. 1135, 89 L.Ed.2d 410 (1986); Owen v. State, 596 So. 2d 985 (Fla.), cert. denied, 506 U.S. 921, 113 S. Ct. 338, 121 L.Ed.2d 255 (1992). In regard to Taylor's Fifth Amendment claim, we find that Taylor was not

being interrogated at the time he made the statements and that Taylor initiated the conversation with the officer. Consequently, there was no Fifth Amendment violation.

Taylor v. State, 630 So. 2d at 1041.

Petitioner submits that FSC's determination was objectively unreasonable and its factual findings are rebutted by clear and convincing evidence. Memorandum at 44. The Court concludes otherwise. An explanation follows.

The record shows Refik Eler, co-counsel for the defense, attended the deposition of John Robert Bogers. Ex. 20 at 750. Detective Bogers attested that Petitioner made a statement to him while the detective was taking Petitioner home after he had his saliva, blood, and hair taken. Id. at 755. Detective Bogers said, Petitioner "asked me how long it would take for a DNA test and blood test and the hair test to come back. And I asked him why and he said, Well, I wondered when you were – I just wanted to know when you were going to come arrest me." Id. Detective Bogers confirmed that Petitioner, pursuant to a search warrant, provided samples. Id. Detective Bogers attested Petitioner was not incarcerated at that time. Id. at 756. The prosecutor, Mr. de la Rionda, clarified that the report actually showed that

Petitioner said, "he was just wondering when he would be back out to pick him up." Id. at 758.

Detective Bogers testified at trial. Ex. 6 at 495. He testified he was employed by JSO on February 14, 1991, and he came into contact with Petitioner on that date. Id. at 496. In a proffer, the prosecutor asked Detective Bogers whether Petitioner was being questioned while the nurse was taking blood, saliva, and hair. Id. at 497. Detective Bogers said Petitioner was not being questioned, but he did make a statement:

> After the nurse took the samples as pursuant to the search warrant, Mr. Taylor asked me how long would it take for the test to be completed and be returned back to us. I asked – I asked him why. At which time he state he was just wondering when we would be back out to pick him up.

Id. at 498.

Mr. Tassone asked whether this occurred at the Duval County Jail, and Detective Bogers confirmed it occurred at the nurse's station at the old jail. Id. He also said he was told that Petitioner had invoked his right not to make any further statements without an attorney present. Id. at 500. Detective Bogers testified Petitioner was not free to leave because he was the subject of a search warrant. Id.

When asked whether Petitioner was in custody at the time of Petitioner's statement, Detective Bogers said Petitioner was not in custody. <u>Id</u>. at 501. Detective Bogers testified that after the search warrant was done and blood taken, he drove Petitioner to his house. <u>Id</u>. Detective Bogers explained, Petitioner made the statement after the search warrant was served and after the blood and saliva were taken. <u>Id</u>. at 502.

Mr. Tassone objected to the statement, asserting that although Petitioner was not under arrest, he was in was in the Duval County Jail in the presence of a homicide detective, subject to a search warrant, and having previously invoked his right to have an attorney present, he was in custody at the time he made the statement to the law enforcement officer. <u>Id</u>. The trial court denied the objection finding Petitioner was at the nurse's station in the jail for the purpose of getting body samples, subsequent to a search warrant. <u>Id</u>. at 503. The court found the statement to be a voluntary statement, not subject to questioning by an officer. <u>Id</u>.

Thereafter, before the jury, Detective Bogers testified on direct examination that after the samples were taken pursuant to a search warrant, Mr. Taylor asked Detective Bogers "how long would it take for the test to be sent off and returned with the results." <u>Id</u>. at 504. Detective Bogers said he asked why, and Petitioner said, he was "just wondering when we would be back

out to pick him up." Id. Detective Bogers confirmed that Petitioner was not being questioned at the time he made his statement. Id. at 504-505.

In ground four, Petitioner raises claims under both the Fifth and Sixth Amendments to the United States Constitution. Notably, "[t]he text of the [Sixth] Amendment provides in pertinent part that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence [sic]." Michigan v. Harvey, 494 U.S. 344, 348 (1990). Of import, "[t]he Fifth Amendment prohibits the admission at trial of compelled testimonial self-incriminating statements—inculpatory statements made to law enforcement while in custody—providing, in relevant part that '[n]o person ... shall be compelled in any criminal case to be a witness against himself[.]'" Gore v. Sec'y for Dep't of Corr., 492 F.3d 1273, 1295 (11th Cir. 2007) (quoting U.S. Const. amend. V), cert. denied, 552 U.S. 1190 (2008).

This Court will give AEDPA deference to the FSC's decision. The decision was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts. As such ground four is due to be denied as AEDPA deference is due and Petitioner is not entitled to habeas relief. An explanation follows.

In the instant case, the Sixth Amendment right to counsel had not attached because the government had not yet committed itself to prosecute.[25] Moran v. Burbine, 475 U.S. 412, 432 (1986). See Gore, 492 F.3d at 1303 (the right "attaches at the initiation of formal criminal proceedings.") (footnote and citations omitted). See also Fellers v. United States, 540 U.S. 519, 523 (2004) (the right attaches when judicial proceedings are initiated by formal charge, preliminary hearing, indictment, information, or arraignment). When Petitioner uttered the comment, on February 14, 1991, he was not under arrest. He was subject to a search warrant and not free to leave until after the samples were taken. Petitioner initiated a conversation, and his comment was not made until after the samples had been taken, when Petitioner was free to leave the jail as he had already provided the samples and was not in custody.

Furthermore, there was no Fifth Amendment (the privilege against self-incrimination) violation because Petitioner was not being interrogated when he made the statement. See Montejo v. La., 556 U.S. 778, 786 (2009) (interrogation by the state is a critical stage of the criminal proceeding); Edwards v. Arizona, 451 U.S. 477, 485-86 (1981) ("The Fifth Amendment right identified in Miranda is the right to have counsel present at any custodial

---

[25] The record demonstrates a judge signed an arrest warrant on February 16, 1991 and Petitioner was arrested on that date. Ex. 1 at 1-2.

interrogation.   Absent interrogation, there would have been no infringement of the right . . . .").[26]

Upon review, Petitioner cannot satisfy the "contrary to" test of 28 U.S.C. § 2254(d)(1) as the state court rejected the claim based on the relevant law pursuant to the Sixth and Fifth Amendments.   The Court finds Petitioner has not shown the state court unreasonably applied the law or unreasonably determined the facts.   Indeed, the state court was objectively reasonable in its inquiry.   Therefore, deference is due to the FSC's decision affirming the decision of the trial court.   Petitioner is not entitled to habeas relief on ground four of the Petition.[27]

---

[26] Miranda v. Arizona, 384 U.S. 436 (1966).

[27] Although Respondents attempt to rely on Stone v. Powell, 428 U.S. 465, 490 (1976) to support their argument, Response at 106-107, the Court finds this argument unpersuasive.   The rationale in Stone v. Powell has not been extended beyond Fourth Amendment search and seizure.   Of import, the Supreme Court declined to extend Stone to Fifth Amendment Miranda claims.   Withrow v. Williams, 507 U.S. 680, 682-83 (1993) ("Stone's restriction on the exercise of federal habeas jurisdiction does not extend to a state prisoner's claim that his conviction rests on statements obtained in violation of the safeguards mandated by Miranda[.]").   The Supreme Court continues to limit Stone's reach. See Respondents' Notice of Supplemental Authority (Doc. 16).   See also Purvis v. Sec'y Dep't of Corr., No. 4:17cv83/WS/EMT, 2018 WL 10509906, at *36 (N.D. Fla. Sept. 4, 2018) (noting the Supreme Court refused to extend Stone to a claim raised pursuant to the Fifth Amendment that statements were elicited without satisfying Miranda), report and recommendation adopted by 2018 WL 5809959 (N.D. Fla. Nov. 5, 2018); Dimanche v. Sec'y, Dep't of Corr., No. 6:11-cv-944-Orl-36DAB, 2013 WL 2447950, at *8 (M.D. Fla. June 5, 2013) (not reported in F.Supp.2d) (same); Thompson v. Gordy, No. 3:15-cv-01329-KOB-JEO, 2018 WL 3749474, at *17 (N.D. Ala. Apr. 25, 2018) (not reported in F. Supp.) (recognizing the Supreme Court made it explicitly clear that the rationale in Stone fails to extend to Fifth, Sixth, or Fourteenth Amendment violations), report and recommendation adopted by 2018 WL 3748403 (N.D. Ala. Aug. 7, 2018); Blackwell v. Sec'y, Dep't of Corr., No. 3:12-cv-518-J-32JBT, 2015 WL 5599828, at *14 (M.D. Fla. Sept. 22, 2015) (not reported in F.Supp.3d)

Accordingly, it is now

**ORDERED AND ADJUDGED:**

1.     The Petition for Writ of Habeas Corpus (Doc. 1) is **DENIED**.

2.     This action is **DISMISSED WITH PREJUDICE**.

3.     The **Clerk** shall enter judgment accordingly and close this case.

4.     If Petitioner appeals the denial of his Petition for Writ of Habeas Corpus (Doc. 1), **the Court denies a certificate of appealability**. [28] Because this Court has determined that a certificate of appealability is not warranted, the **Clerk** shall terminate from the pending motions report any motion to proceed on appeal as a pauper that may be filed in this case.   Such termination shall serve as a denial of the motion.

**DONE AND ORDERED** at Jacksonville, Florida, this 19th day of May, 2021.

_____
BRIAN J. DAVIS
United States District Judge

(finding respondents incorrect in their assertion that Stone bars Sixth and Fourteenth Amendment claims).

[28] This Court should issue a certificate of appealability only if a petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).   To make this substantial showing, Petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," Tennard v. Dretke, 542 U.S. 274, 282 (2004) (quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further,'" Miller-El v. Cockrell, 537 U.S. 322, 335-36 (2003) (quoting Barefoot v. Estelle, 463 U.S. 880, 893 n.4 (1983)).   Upon due consideration, this Court will deny a certificate of appealability.

sa 5/13
c:
Counsel of Record